STROMBERG ELECTRIC CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 3398.   Promulgated November 3, 1927.

1. The evidence in this proceeding shows that the assets of the Stromberg Electric Co., a predecessor corporation organized under the laws of the State of Illinois, were acquired by the petitioner in exchange for petitioner's stock.

2. The amount that petitioner may include in its invested capital on account of intangibles acquired in exchange for stock determined.

*James W. Good, Esq.,* and *Valentine Hechler, Esq.,* for the petitioner.

*Geo. G. Witter, Esq.,* for the respondent.

This proceeding is for the redetermination of income and profits tax for the calendar years 1918, 1919, and 1920. The Commissioner asserts that for 1918 there was an overassessment of $14,485.55; that for 1919 there was an overassessment of $5,529.49; and that for 1920 there is a deficiency of $25,753.90. The petitioner alleges that the Commissioner erred in that he failed to include in invested capital any amount on account of intangibles.

The petitioner is a Maine corporation with its principal office and chief place of business in Chicago, Ill. It was organized December 29, 1913, and within a few days thereafter it acquired a business

which previously had been conducted by various corporate antecedents, the Stromberg Electric Co., organized under the laws of Illinois on May 1, 1910, being its immediate predecessor. The business was originally organized in 1903 to develop a portable time-recording stamp embodying a clock-driven mechanism which had been invented by a man named Purdy. This stamp was still being manufactured at the end of 1913, but only to a very limited extent. Many difficulties were experienced in perfecting the clock-driven mechanism, the principal defect being its lack of ruggedness. This factor, coupled with its limited field of usefulness, led to the ultimate withdrawal of the device from the market. Also in 1903 a competitor had placed on the market an electrically driven time recorder.

The mechanism of the competing recorder had certain inherent defects which, in a great many instances, caused an inaccurate recordation of time. In 1905 a man named Crook, an employee of the Perry Time Stamp Co., which was the originator of petitioner's business, invented an electrically driven time-recording mechanism which, to a large extent, corrected the faults existing in the competing device. The first recorders employing the mechanism invented by Crook were manufactured in 1906. These devices were placed with friendly manufacturers who would give them a fair trial. An application for a patent covering the mechanism was filed in 1907. Due to faults which developed in the recorders it was not until 1908 that a stable product was developed and in that year the application filed in 1907 was abandoned and a reapplication was filed. The application filed in 1908 embodied the basic principle of an electrically driven geared train. Nearly all of the claims set forth in the application had been allowed prior to 1914 and the patent was issued June 15, 1915.

The electrically driven mechanism developed for use in the portable electric time stamp was also utilized in the manufacture of a stationary time recorder which was devised to record the time at which employees arrived and departed from work and also to record the amount of time spent by workmen upon various jobs. This device was known as an in-and-out recorder and opened up a sales field much larger in scope than the one available to the portable recorder. The development of the in-and-out recorder was started in 1909, at which time two other companies were manufacturing a similar device. The mechanisms employed in the competing devices were not as satisfactory as the one invented by Crook and the introduction of in-and-out recorders containing the latter mechanism eventually eliminated the competing recorders. Application for a patent on the in-and-out recorder was filed May 13, 1910, nearly all of the claims had been allowed prior to 1914, and the patent was

issued June 15, 1915. This was the basic patent on that type of recorder.

From 1903 to 1910 comparatively few products were manufactured and sold, the petitioner's predecessor being engaged almost wholly in developing the type of recording devices now manufactured by the petitioner. These devices include, in addition to the portable time stamp and the in-and-out recorder, an automatic time-signaling device and an electric system by which any number of time-recording devices for various purposes, as well as clocks for observing time, can be controlled by one master clock. This latter system results in the maintenance of uniform time throughout an establishment, all devices registering the same time at all times.

From 1910 to 1913 the activities of the business were divided between developing machinery to manufacture the mechanically perfected devices and developing a sales field for the manufactured products. At the time the petitioner was organized its predecessor was the owner or assignee of 18 patents and 14 patent applications, the acquisition of which by petitioner gave it complete protection. Competition was steadily decreasing and the petitioner's predecessor had built up a sales field by selling its devices to over 800 customers, one of whom, the Western Union Telegraph Co., subsequently purchased from petitioner over $450,000 worth of equipment.

The principal stockholders of the predecessor corporation were Alfred Stromberg and Androv Carlson, who were also its chief executives and financial backers. At the beginning of the year 1913 Stromberg was ill, Carlson had retired from business, and neither was available as a source of further financial or managerial assistance. The other stockholders concluded that the business should be reorganized and negotiations were entered into with William P. Martin, a man of large means and experience in manufacturing enterprises, looking toward his becoming interested in the business.

The negotiations were carried on in substantial accordance with a proposed scheme of reorganization which was acceptable to all of the stockholders and which stated:

The parties signing this instrument, or one of its counterparts, have each simultaneously endorsed in blank the certificate or certificates representing their stock holdings and have delivered or caused the same to be delivered to Keene H. Addington, Esq., in escrow to the end that the corporate plan of re-organization hereinafter set forth may be accomplished, said stockholders, and each of them, jointly and severally, hereby authorizing and empowering said escrow holder to do and perform each and every act expedient or necessary to carry into full effect the plans and purposes set forth in this instrument, including specifically the making of the exchange of securities hereinafter provided for.

First. A new corporation to be formed under the laws of the State of Delaware or such other State as said escrow holder may determine, under the

name of Stromberg Electric Company, or such other name as said escrow holder may select, with capital stock issues substantially as follows:

A non-voting first preferred stock, of the par value of one hundred dollars ($100) per share, in amount equal to the fresh cash which may from time to time be invested in said new corporation.

A non-voting second preferred stock, of the par value of one hundred dollars ($100) per share, in amount equal to the obligations, principal and interest, represented by said promissory notes held by stockholders hereinbefore referred to, for which said notes said second preferred stock is to be substituted as hereinafter provided.

A non-voting third preferred stock, of the par value of ten dollars ($10) or one hundred dollars ($100) per share, as said escrow holder. shall determine, in amount aggregating one hundred and twenty-five thousand dollars ($125,000).

A common stock, of the par value of one hundred dollars ($100) per share, in amount aggregating the sum of one hundred and twenty-five thousand dollars ($125,000).

The rights and privileges of said several classes of stock to be set forth in certificates all in effect, if not in language, substantially as follows: * * *

SECOND. That all of the assets of said Stromberg Electric Company, of Illinois, of every kind, including cash on hand, bills and accounts receivable, merchandise manufactured, partly manufactured and unmanufactured, patents and good will, shall be delivered, transferred, conveyed and assigned to said new corporation; the liabilities of said Stromberg Electric Company of Illinois, to be assumed by said new corporation provided the same are not in excess of the aggregate amounts hereinbefore represented, and provided, further, that the directors of said new corporation consider the same equivalent in money value to the par value of the second preferred stock, the third preferred stock and the common stock issues hereinbefore provided for and will issue said three several stock issues fully paid and nonassessable in exchange therefor. Certificates to be issued to the various parties shown by this instrument to be entitled thereto and in the event of discrepancy between the recitals of this instrument and the certificates or evidences of indebtedness deposited with the escrow holder, the escrow deposit to control.

THIRD. Said first preferred stock to be sold from time to time at par for cash, the amounts to be issued from time to time to be determined solely by said new corporation and the right to purchase the same without any obligation so to purchase to inhere in the holders of the common stock; it being the purpose of the re-organization hereby provided for to give to said common stock the full control of said new corporation including the right to liquidate said new corporation for the purpose, among others, of providing for the retirement of said first preferred stock.

FOURTH. Said second preferred stock shall be issued dollar for dollar in liquidation for and in settlement of the promissory notes held by the stockholders aforesaid, which said notes have by the respective owners thereof been delivered to said escrow holder with authority hereby expressly conferred to cancel the same in exchange for said second preferred stock as herein provided.

FIFTH. Said third preferred stock after deducting 5 per centum (5%) of the aggregate amount thereof, that is to say, sixty-two hundred and fifty dollars ($6,250) of the par value thereof, to be delivered as and by way of compensation to the law firm of Jones, Addington, Ames, and Seibold for the negotiation of the deal by which this proposition for reorganization may be effected, shall be

delivered to the present stockholders of said Stromberg Electric Company, of Illinois, *pro-rata* according to their respective stock holdings therein, as hereinbefore specially set forth, said holdings to be cancelled concurrently with the exchange provided for.

SIXTH. Said common stock shall be delivered to the person or persons whom said escrow holder shall obtain to finance, manage, and control said new corporation, to be and become the sole and absolute property of such person or persons.

SEVENTH. After the organization of said new corporation and the distribution of the stock thereof as hereinbefore provided, said Stromberg Electric Company, of Illinois, shall be dissolved and its charter surrendered.

EIGHTH. It is understood that said escrow holder is acting as the attorney for the party or parties who are considering the acceptance of the proposition in this instrument contained; that the stock fee hereinbefore provided to be paid to the firm of said escrow holder is by way of services for promotion; that the legal costs and expenses incurred in connection with the preparation of this instrument and in carrying forward the plans and purposes herein set forth are to be advanced by the party or parties so considering this proposition but ultimately paid by said new corporation if this proposition is accepted and the plans thereof consummated.

NINTH. In addition to other salaries which may lawfully be voted, the owners of said common stock, may, notwithstanding their interest, provide for a salary to himself or themselves of six thousand dollars ($6,000) per annum until such time as said third preferred stock shall be placed upon a four per centum basis; after said stock shall have been placed on a four per centum basis, said salary may be increased to the sum of ten thousand dollars ($10,000) per annum.

TENTH. Acceptance of the proposition by the parties now considering the same shall make this instrument irrevocable by any party or parties in interest.

The business and the proposed plan of reorganization were considered favorably by Martin and the petitioner was organized as the first step. Thereafter the directors of the Stromberg Electric Co. (Illinois) met on January 9, 1914, the minutes of that meeting reading in part as follows:

The president then stated that the main object of the meeting was to carry out and conclude a proposition involving the reorganization of the company which had been made by all the stockholders of the company with the exception of Messrs. H. A. Jones, George E. Dixon and H. N. Moseley; that he had personally purchased, for the sum of one hundred dollars ($100), an option on the stock of Mr. H. A. Jones, to be taken up by the payment of the further sum of fifty-nine hundred dollars ($5,900); that Mr. George E. Dixon as to ninety-four (94) shares had joined in the proposition referred to but had withheld his consent as to the remaining fifty (50) shares owned by him in the company; that as to such fifty (50) shares he had personally acquired an option to purchase the same for the sum of twenty-five hundred dollars ($2,500); that Mr. H. N. Moseley had given his consent to the proposition but that one (1) share of the four (4) held by him had been assigned to a third party who would not give his consent; that he had personally purchased that one (1) share and paid therefor the sum of forty dollars ($40); that he had personally assured Mr. William P. Martin, to whom said written proposition of reorganization had been submitted, that he would see to it that the options aforesaid were exercised. The President thereupon

proposed that the company purchase with its funds the stock referred to by him and direct that the same when obtained be retired and cancelled. Thereupon a resolution was presented by Mr. Androv Carlson, which on motion by Mr. A. C. Bryan, seconded by Mr. J. C. Bryan, was unanimously adopted, which said resolution was and is in words and figures as follows:

RESOLVED that eight thousand five hundred and· forty dollars ($8,540) be appropriated out of the funds of the company and turned over to Mr. Charles M. Crook to reimburse him for expenditures made and to be made in connection with the acquirement of ninty-three (93) shares of the stock of this company standing in the name of H. A. Jones, fifty (50) shares standing in the name of Mr. George E. Dixon and one (1) share standing in the name of H. N. Moseley.

BE IT FURTHER RESOLVED that the several certificates represented by the stock of H. A. Jones, George E. Dixon and H. N. Moseley respectively, when duly acquired, be canceled.

The President thereupon further stated that Mr. Martin had caused to be organized a new corporation under the laws of the State of Maine under the name of STROMBERG ELECTRIC COMPANY with a total capitalization of four hundred and ninety thousand dollars ($490,000), divided as follows:

> First preferred, two hundred thousand dollars ($200,000) ;
> Second preferred, forty thousand dollars ($40,000) ;
> Third preferred, one hundred and twenty-five thousand dollars ($125,000) ; and
> Common, one hundred and twenty-five thousand dollars ($125,000).

that in view of the retirement of the stock to be purchased on behalf of the corporation the amount of third preferred stock which would be issued in the new corporation would be correspondingly reduced; that said new corporation had been organized pursuant to and in conformity with the proposition which had been submitted to, approved and signed by the stockholders of this company *and that it would be in order for a resolution to be submitted to the meeting offering to sell the assets, business and good will of this company to the new corporation which has been so organized.* Thereupon a resolution was presented by Mr. Androv Carlson, which on motion by Mr. A. C. Bryan, seconded by Mr. J. C. Bryan, was unanimously adopted, which said resolution was and is in words and figures as follows:

RESOLVED that the president of this company offer to sell, assign and transfer to Stromberg Electric Company, a corporation of the State of Maine, all of its assets of every kind, including cash on hand, bills and accounts receivable, merchandise manufactured, partly manufactured and unmanufactured, patents and good will upon condition that said company assume all of the liabilities of this company, except the liabilities provided to be liquidated by the issue of second preferred stock, for and in consideration of the second preferred, third preferred and common stock provided for in said written proposition, except as the amount of said third preferred is reduced by the retirement of stock purchased by this corporation.

RESOLVED FURTHER that if this offer is accepted the president and secretary of this company be, and they are hereby authorized to make, execute, acknowledge and deliver for and in the name and on behalf this company all necessary or proper bills of sale, assignments and transfers essential or expedient to pass the title to the assets, business and good will of this company, including all leases now enjoyed by it and all other interests of any kind or character.

RESOLVED FURTHER that if this offer is accepted, that the stock certificates to be issued shall be issued pursuant and in accordance with said written

proposition for reorganization and shall be delivered to Keene H. Addington, Esq., as escrow holder to be distributed pursuant to and in conformity with the terms of said proposition. (Italics ours).

At a meeting of the directors of the Stromberg Electric Co. (Maine) held on January 9, 1914, the offer was accepted, the minutes of that meeting reading as follows:

Minutes of a meeting of the directors of STROMBERG ELECTRIC COMPANY held at Room 1610—105 West Monroe Street, Chicago, Illinois, on the ninth day of January, 1914, at two o'clock P. M.

PRESENT: Granger Farwell, Joseph B. Edwards, Robert Lewis Ames, Walter Hamilton, William Perry Hahn.

Mr. William Perry Hahn was chosen chairman of the meeting and called the same to order.

Mr. Walter Hamilton was chosen and acted as Secretary of the meeting.

Mr. Hahn stated that Mr. Charles M. Crook, President of Stromberg Electric Company, of Illinois, was present and desired to present a written proposition on behalf of said Stromberg Electric Company, of Illinois, and the individual stockholders thereof, which said proposition (a copy of which is hereinafter incorporated in these minutes) was ordered placed on file and preserved among the records of the company.

Thereupon the meeting proceeded to the discussion of said proposition and a review of the financial, patent and general situation of Stromberg Electric Company, of Illinois, and thereupon after said discussion Mr. Granger Farwell presented and moved the adoption of a resolution, which motion was duly seconded by Mr. Joseph B. Edwards and unanimously carried, which said resolution was and is in words and figures as follows, to-wit:

WHEREAS a proposition has been made to this company in writing by Stromberg Electric Company, of Illinois, which said proposition is in words and figures as follows, to-wit:

CHICAGO, *January 9, 1914.*

To STROMBERG ELECTRIC COMPANY, a Maine corporation:

I have been duly authorized by resolution unanimously adopted by the directors of Stromberg Electric Company, of Illinois, to offer to sell, assign and transfer to your company all of the assets of said Stromberg Electric Company, of Illinois, of every kind, including cash on hand, bills and accounts receivable, merchandise manufactured, partly manufactured, and unmanufactured, patents and good will, upon condition that your company assume all of the liabilities of said Stromberg Electric Company, of Illinois, for and in consideration of the issue of capital stock in your company to the persons and in the amounts named in the respective schedules hereto attached, marked respectively Schedule A, Schedule B and Schedule C. If this offer is accepted I have been authorized and directed to request your company to deliver all stock certificates mentioned and specified in said schedules respectively, to Keene H. Addington, Esq., who has been appointed by the various persons entitled to said stock certificates to receive and distribute the same.

(Signed)     C. M. CROOK.

And WHEREAS it appears to the satisfaction of the board of directors of this company that the assets, business and good will so offered are of a fair net cash market value in excess of the par value of the stock requested in payment therefore:

Now, THEREFORE, BE IT RESOLVED:

(1) That the proposition of said Stromberg Electric Company, of Illinois, be, and the same is hereby accepted.

(2) That upon receiving the proper instruments transferring the assets mentioned and referred to in said proposition, the officers of this company shall issue and deliver the stock of this company in the amounts specified in said proposition and to the persons therein designated.

(3) That the stock subscriptions of the various persons to whom said stock shall be issued shall be deemed and taken as fully paid and non-assessable.

(4) That this company upon the consummation of the transaction herein provided for shall be deemed to have assumed each and every of the liabilities of said Stromberg Electric Company, of Illinois, so far as the same have been disclosed to this Company.

And thereupon, on motion duly made and seconded, the meeting adjourned.

The petitioner thereupon issued second preferred stock of a total par value of $37,200; third preferred stock of a total par value of $115,500; and common stock of a total par value of $125,000. The escrow holder distributed the second preferred stock to the note holders of the predecessor corporation; the third preferred stock to the stockholders of the predecessor corporation in proportion to their stock holdings therein; and the common stock to the nominee of the predecessor corporation who, in turn, endorsed it to Martin. In return for its second preferred, its third preferred, and its common stock the petitioner received all of the assets of the Stromberg Electric Co. (Illinois) consisting of a mixture of tangibles and intangibles. The intangibles were set up in petitioner's books on January 16, 1914, at a value of $198,360.41. The books of the predecessor corporation contained two accounts headed development account and patents, showing totals of $90,421.38 and $17,577.86, respectively.

Sales of first preferred stock—representing fresh capital—and the total par value of each class of stock outstanding for each of the years 1914 to 1919, inclusive, were as follows:

| Year | 1st preferred sold | 1st preferred outstanding as at Dec. 31 | 2nd preferred outstanding as at Dec. 31 | 3rd preferred outstanding as at Dec. 31 | Common outstanding as at Dec. 31 | Total stock outstanding as at Dec. 31 |
|---|---|---|---|---|---|---|
| 1914 | $25,000 | $25,000 | $37,200 | $115,500 | $125,000 | $302,700 |
| 1915 | 13,000 | 38,000 | 34,500 | 115,500 | 125,000 | 313,000 |
| 1916 | 12,000 | 50,000 | 34,500 | 115,500 | 125,000 | 325,000 |
| 1917 | | 50,000 | 34,500 | 115,500 | 125,000 | 325,000 |
| 1918 | 25,500 | 75,500 | 34,500 | 115,500 | 125,000 | 350,500 |
| 1919 | 59,600 | 135,100 | 34,500 | 115,500 | 125,000 | 410,100 |

All of the first preferred stock was sold at par. The first sale of this class of stock was made on February 5, 1914. It was sold to William P. Martin, as was all of the first preferred stock that was sold in the years 1914, 1915, and 1916. Of the $25,500 worth of stock sold in 1918, $20,000 worth was sold to Martin and $5,500 to others. In 1919, $45,000 worth was sold to Martin and $14,600 worth was sold to others.

The predecessor corporation's sales and net profits for each of the years of its existence were as follows:

| Year | Sales | Net profit |
|------|-------|------------|
| 1910 | $35, 321. 30 | $11, 890. 03 |
| 1911 | 60, 073. 02 | [1]3, 522. 79 |
| 1912 | 88, 178. 85 | 5, 172. 53 |
| 1913 | 92, 208. 78 | [2]6, 079. 48 |
| Total | 275, 781. 95 | 19, 619. 25 |

[1] Loss.    [2] Based on estimated inventory December 31, 1913.

Petitioner's sales, invested capital, exclusive of intangibles, and net profit for each of the years 1914 to 1920, inclusive, were:

| Year | Sales | Invested capital (Not including $198,360.41) | Profit before Federal taxes |
|------|-------|---------------------------------------------|------------------------------|
| 1914 | $86, 587. 74 | $105, 176. 59 | $2, 022. 03 |
| 1915 | 147, 387. 78 | 122, 717. 34 | 29, 189. 90 |
| 1916 | 231, 877. 70 | 159, 384. 02 | 45, 708. 28 |
| 1917 | 406, 471. 72 | 211, 921. 18 | 68, 195. 87 |
| 1918 | 662, 483. 45 | 254, 266. 85 | 66, 296. 30 |
| 1919 | 643, 461. 24 | 298, 028. 85 | 23, 741. 63 |
| 1920 | 942, 571. 88 | 331, 296. 97 | 100, 247. 05 |

Dividends were paid by petitioner on its various classes of stock for the years 1914 to 1920, inclusive, as follows:

| | On first preferred stock | On second preferred stock | On third preferred stock | On common stock |
|---|---|---|---|---|
| 1914 | $905. 05 | | | |
| 1915 | 1, 142. 36 | $708. 00 | | |
| 1916 | 3, 332. 44 | 2, 587. 50 | | |
| 1917 | 3, 480. 16 | 4, 657. 50 | $3, 465. 00 | $9, 375. 00 |
| 1918 | 3, 614. 93 | 2, 070. 00 | 4, 620. 00 | 12, 500. 00 |
| 1919 | 5, 032. 99 | 2, 070. 00 | 4, 620. 00 | 12, 500. 00 |
| 1920 | 8, 845. 82 | 2, 070. 00 | 4, 620. 00 | 12, 500. 00 |

On April 9, 1914, there were recorded in the Patent Office three assignments by the Stromberg Electric Co. (Illinois) to the Stromberg Electric Co. (Maine) covering all of the former's interest in the 18 patents and 14 patent applications. Each assignment recited a consideration of $1 and other good and valuable consideration.

OPINION.

SMITH: The Commissioner having determined an overassessment for each of the years 1918 and 1919, the Board is without jurisdiction of so much of the appeal as pertains thereto. *Appeal of R. P. Hazzard Co.*, 4 B. T. A. 150, and *Appeal of Cornelius Cotton Mills*, 4 B. T. A. 255.

The issues raised with respect to the year 1920 are (1) whether petitioner's original issue of stock was issued in exchange for the

stock of its predecessor or whether it was issued in exchange for the assets of its predecesor; and (2) what amount, if any, should be included in petitioner's invested capital for income-tax purposes as representing the value of intangibles acquired by it upon the reorganization of its predecessor, the Stromberg Electric Co., an Illinois corporation.

The petitioner contends that the reorganization was predicated upon and consummated through an exchange of stock for stock and that there should be included in its invested capital the sum of $198,360.41 as representing the value of intangibles as at the date of the reorganization of its predecessor. The respondent contends that the reorganization was accomplished by means of an exchange of stock for assets and that no amount should be included in petitioner's invested capital on account of intangibles in the absence of proof of any actual cash value at the time it was paid in for stock.

In support of its contention that the reorganization was effected through an exchange of stock for stock the petitioner relies mainly on the proposed plan of reorganization that was approved by the stockholders of its predecessor as representing the intention of the parties to the reorganization. Counsel for the petitioner argue that the directors of the two corporations acted pursuant to and in accordance with the terms and intent of that plan; that the steps leading up to the organization of petitioner should be considered as well as the acts whereby the transfer took place; that if such acts are considered as a whole it becomes apparent that the ideas and intentions of all parties to the reorganization were strictly carried out and that the reasoning of the court in *United States* v. *Board*, 14 Fed. (2d) 459, is applicable here.

While it would seem that the stockholders of the predecessor corporation had in mind an exchange of the stock then held by them for stock in a new corporation to be organized, it should be borne in mind that the proposed plan of reorganization was accepted by the stockholders prior to the incorporation of the petitioner. It would also seem that as far as the stockholders of the predecessor were concerned the reorganization resulted in the receipt by them of stock in a new corporation in place of the stock formerly owned by them, but we can not be guided solely by such results. The acts of the two corporations are the determining factors.

The predecessor corporation by appropriate act of its directors made an offer to the petitioner to sell its assets for the petitioner's stock. This offer was accepted by the petitioner through the appropriate act of its directors. Herein the instant case differs from the case of *United States* v. *Board, supra,* which was relied on by the

11340°—28——77

petitioner. In that case the court had for its consideration an agreement entered into between the Kentucky Wagon Manufacturing Co. and the stockholders of the Dixie Motor Car Co. The court pointed out that the stockholders had no authority to act for the Dixie Motor Car Co. and that they could transfer only the stock which they themselves owned. Consequently, in order to make the agreement enforceable, the court held that there had been an exchange of stock for stock. In the case at bar it is noted also that immediately after the reorganization the petitioner set up in its books of account, as assets and liabilities, the assets and liabilities of its predecessor and it does not appear that any of the stock of the predecessor corporation was set up in its books.

In view of the foregoing we are of the opinion that the reorganization was effected through the sale of the assets of the predecessor corporation to the petitioner, it being immaterial that the stock received in payment therefor was distributed in accordance with a certain schedule which had received the prior approval of stockholders of the old corporation. Section 326(a)(4) of the Revenue Act of 1918 provides that there may be included in invested capital—

Intangible property bona fide paid in for stock or shares prior to March 3, 1917, in an amount not exceeding (a) the actual cash value of such property at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding on March 3, 1917, whichever is lowest.

The total amount of petitioner's stock outstanding on March 3, 1917, was $325,000. Consequently, the largest amount that may be included in petitioner's invested capital on account of intangibles acquired from its predecessor upon reorganization will be one-fourth of that amount, namely, $81,250.

Relative to the second issue the petitioner contends that if the Board should find that there was an exchange of assets for stock it should be allowed to include in invested capital the sum of $81,250 on account of intangibles. In support of this contention each of three witnesses testified that in his opinion there had been invested in the business from the date of its first organization in 1903, to the end of 1913, the sum of $300,000; that at the end of 1913 the tangible assets of the predecessor corporation were worth $100,000; and that the intangible assets, including patents, patent applications and good will, were worth $200,000. One of these witnesses, William P. Martin, had had experience in manufacturing enterprises and for some time previous to his becoming interested in the petitioner had investigated a great many business concerns from a standpoint of personal investment. He testified that his opinion was based on a thorough personal investigation of the predecessor corporation; that he was satisfied that the intangible assets were worth $200,000,

and that the issuance of $277,700 par value of stock for all the assets, both tangible and intangible, was very conservative. Walter Clyde Jones, another of the witnesses, was a stockholder and a director of the predecessor corporation and had served for many years as its patent attorney. He testified that, based on his knowledge of the old corporation and the experience gained by him in the conduct of a large patent practice, the intangibles of the predecessor corporation were worth $200,000. The other witness, Walter D. Steele, an engineer and former stockholder of the old corporation, testified that in his opinion, based on his knowledge of the conduct of the business of the predecessor corporation, its intangibles were worth $200,000. The petitioner also points out that, eliminating the earnings of the petitioner for the year 1914 as being subnormal, the earnings for the five years, 1915 to 1919, inclusive, averaged $46,626.39 on average tangible assets of $209,263.65, and that capitalizing the average annual profits on a basis of 20 per cent after deducting a return of 8 per cent on average tangible assets would give a value to intangibles of $149,426.50.

Counsel for the respondent argues that the increase in earnings of the petitioner over those of its predecessor were due mainly to the injection of new capital and management into the business, and that, if the stock issued in exchange for the assets of the old corporation was worth par, after deducting therefrom the value given by the petitioner to the tangible assets, amounting to $132,013.85, plus liabilities assumed, which amounted to $19,415.53, the value of the intangibles would be $126,270.62.

He points out that the petitioner admitted that the predecessor corporation made improper entries in the development and patent accounts set up in its books; that the earnings of the predecessor corporation were not sufficient to provide even a reasonable return on tangibles; that no dividend was paid on either the common stock or the third preferred stock during the years 1914, 1915, and 1916, and that the dividend paid in 1917 on those classes of stock amounted to only 7½ per cent on common stock and 3 per cent on third preferred stock. In view of the foregoing, he argues that, having in mind the conditions which obtained prior to 1914, the stock was not worth par and furthermore that no acceptable method has been presented whereby the value of the intangibles may be ascertained.

We are convinced, however, that the patents, patent applications, and good will of the predecessor corporation were worth a substantial sum at the time they were acquired by the petitioner. The testimony adduced at the hearing shows that the resources of the business prior to the time it was acquired by the petitioner were expended in developing and perfecting time-recording mechanisms and in developing a sales field for the perfected devices. During the year 1913

the predecessor corporation was in a position, as far as perfection of product and sales field were concerned, to take up a manufacturing program on a large scale, but due to lack of capital and management it was unable to convert potentialities into actualities. It enjoyed patent protection to such an extent that serious competition existed only as a remote possibility.

That the business had reached a point where it was capable of making material progress is indicated by the fact that after one year's operation with the investment of only $25,000 additional capital the petitioner began to make comparatively large profits. It is reasonable to assume that the petitioner required a year to build up and perfect its manufacturing processes. If we disregard the earnings of the year 1914 as a measure of the earning power of the business and capitalize the earnings of the petitioner's first representative year, namely, 1915, on a 10 and 20 per cent basis, an intangible valuation of $84,590.85 is indicated.

We have indicated in other cases that opinion evidence is to be considered with caution. Nevertheless, the testimony of William P. Martin, the organizer and moving spirit of the petitioner, is impressive. From his testimony it appears that he has had considerable experience in manufacturing enterprises; that for months prior to the organization of the petitioner he had examined and investigated the business and products of its predecessor; that he was induced to become interested in the business by reason of its possibilities; that the tangible assets of the predecessor were of minor importance from a manufacturing standpoint, and that the chief value of the business lay in its intangibles.

It has been pointed out that the petitioner can not include in invested capital on account of intangibles more than $81,250, and, in view of all the evidence submitted, we are of the opinion that the value of the intangibles received by the petitioner in exchange for its stock was at least equal to that sum.

*Judgment will be entered on 15 days' notice, under Rule 50.*

Considered by LITTLETON, TRUSSELL, and LOVE.